# EXHIBIT C



IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>KYLE RAMSTETTER,<br><br>Defendant. | No. 1:23-CR-27 (RDA) |

## STATEMENT OF FACTS

The United States and the defendant, KYLE RAMSTETTER ("RAMSTETTER"), stipulate that the allegations in the one-count Criminal Information and the following facts are true and correct. The United States and the defendant further stipulate that had the matter gone to trial, the United States would have proven the allegations in the Criminal Information and the following facts beyond a reasonable doubt.

### I.    Introduction

1.    As set forth in greater detail below, from at least in or around December 2017 and continuing through in or around September 2019, in the Eastern District of Virginia and elsewhere, defendant RAMSTETTER, B.W., C.N., C.H.K., C.V.K., R.A., and others known and unknown, did knowingly conspire and agree with each other to commit honest services wire fraud, that is: having devised and intending to devise a scheme and artifice to defraud the Victim Company of its right to the honest services of its employees through bribery or kickbacks, to transmit and cause to be transmitted by means of wire communication in interstate commerce writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Sections 1343 and 1346.

2.    More specifically, it was the purpose of the conspiracy to engage in a kickback scheme through which B.W. and Company 1 made kickback payments to employees of the Victim Company, C.N. and C.H.K., which payments RAMSTETTER helped to facilitate, in exchange for those employees steering real estate development deals in the Eastern District of Virginia and elsewhere from the Victim Company to Company 1.

## II.    Factual Background

### A.    Relevant Individuals, Entities, and Transactions

3.    Company 1 was a Denver, Colorado-based commercial real estate and development company. B.W. was Company 1's Chief Executive Officer ("CEO").

4.    Since in or around 2018, the Victim Company executed leases with Company 1 for nine real estate developments in Northern Virginia, within the Eastern District of Virginia. The total approved to be spent for these deals was approximately $415.5 million.

5.    In or around November 2017, RAMSTETTER began working at Company 1 as a project manager, and was soon promoted to Director of Development. In that role, RAMSTETTER was responsible for managing the Northern Virginia real estate development deals involving the Victim Company and Company 1, on behalf of B.W. RAMSTETTER worked with W.C., who was a financial analyst at Company 1, on many of these real estate development deals.

6.    At all times relevant to the conspiracy, C.H.K. was an employee of the Victim Company overseeing real estate development in Northern Virginia, including the nine real estate development deals involving Company 1. Until approximately mid-June 2019, C.N. was a Senior Manager of Real Estate at the Victim Company and was C.H.K.'s supervisor. C.N. was also involved in real estate transactions on behalf of the Victim Company in Northern Virginia.

7.      J.C.L. was a civil engineer and real estate consultant on real estate deals involving the Victim Company, including deals in Northern Virginia.

B.      *RAMSTETTER's Knowledge and Facilitation of Kickback Payments from Company 1 to Employees of the Victim Company*

8.      Within approximately one month of starting work at Company 1, RAMSTETTER began receiving emails from B.W. relating to C.V.K., who was a long-time friend of B.W. RAMSTETTER came to understand that C.V.K. was the brother of C.H.K., who was the Victim Company employee who oversaw the real estate development deals in Northern Virginia involving Company 1 and the Victim Company.

9.      RAMSTETTER also saw an Independent Contractor Agreement between Company 1 and an entity called the Villanova Trust, which was ostensibly controlled by C.V.K. RAMSTETTER learned that Company 1 was making payments to the Villanova Trust in the form of purported "referral fees" in connection with the real estate development deals involving the Victim Company. RAMSTETTER recognized that these fees, however, were much higher than other referral fees that he had seen paid out by other commercial real estate companies, including other companies for which RAMSTETTER had previously worked. RAMSTETTER was also aware that C.V.K. never added any actual value on Company 1's development deals with the Victim Company.

10.      Instead, RAMSTETTER came to understand that the purported referral fees from Company 1 to the Villanova Trust were actually disguised kickback payments that were intended for the benefit of employees of the Victim Company, namely, C.H.K. and C.N., in exchange for those employees' roles in facilitating and steering real estate development deals in Northern Virginia to Company 1.

3

11.    The kickback payments from B.W. and Company 1 to C.H.K. and C.N. were hidden by the use of various trusts and other shell entities that had been created by R.A., a Colorado-based attorney, for the purpose of concealing the kickback scheme.  D.V.L., an acquaintance of R.A., was installed as the purported manager of some of these shell companies. In reality, however, C.N. and other members of the conspiracy described D.V.L. to RAMSTETTER as a "straw guy."

12.    While RAMSTETTER was employed at Company 1, B.W. also paid for RAMSTETTER, C.H.K., and C.N. to take trips together, including fishing trip to Florida and a 10-day hunting trip to New Zealand.  C.H.K. and C.N. told RAMSTETTER that they were not disclosing these trips to the Victim Company.

13.    The Victim Company's employees, such as C.H.K. and C.N., were not authorized to receive referral fees or other compensation associated with the Victim Company's real estate deals.

C.    *Land Flip Transaction Involving White Peaks Capital, LLC and the Victim Company in July 2019*

14.    In addition to working as the Director of Development at Company 1, RAMSTETTER was also the majority partner of White Peaks Capital, LLC ("White Peaks"), a limited liability corporation that also conducted business with the Victim Company.  W.C., Company 1's financial analyst, was the minority partner in White Peaks.

15.    On or about April 22, 2019, RAMSTETTER and W.C., doing business as White Peaks, and while both were still employed at Company 1, put an approximately 89-acre parcel of land under contract in Northern Virginia, within the Eastern District of Virginia, for approximately $98,670,000.  This property would later be "flipped" to the Victim Company at a substantial profit for White Peaks, and a commensurate increased cost for the Victim Company.

16.    RAMSTETTER subsequently engaged in negotiations with C.H.K. and C.N. to sell the land to the Victim Company.  Throughout those conversations, C.N. and C.H.K., who was then still employed by the Victim Company, expressed a desire and expectation that RAMSTETTER and White Peaks would kick back a significant portion of the profits from the land flip transaction involving the Victim Company to C.N. and C.H.K. through one of the shell companies that R.A. had established and that C.N. and C.H.K. ultimately controlled. C.N provided RAMSTETTER with a "Facilitator Agreement" that called for 66% of White Peaks' profits on the land flip transaction to be kicked back to C.N. and C.H.K. through one of their shell entities.  C.N. also told RAMSTETTER that C.H.K. and the Victim Company would steer more real estate deals to White Peaks in the future if RAMSTETTER made that requested payment, and that C.H.K. could "blow up" or "derail" (i.e., terminate) the deal regarding the sale of the 89-acre parcel of land to the Victim Company if RAMSTETTER did not make the kickback payment.

17.    On or about July 29, 2019, White Peaks officially acquired the Northern Virginia property for $98,670,000 and simultaneously sold it on that same date to the Victim Company for $116,389,000, resulting in a gross profit of $17,719,000 to White Peaks.  RAMSTETTER and W.C. agreed to split the profits from this land flip transaction 51%/49%, respectively.

18.    RAMSTETTER, W.C., and White Peaks did not make any kickback payments to C.H.K. or C.N. prior to the July 29, 2019 closing.  However, in response to repeated requests from C.N, C.H.K., and others, RAMSTETTER, with W.C.'s knowledge and understanding, ultimately agreed to make a $1,000,000 payment to C.H.K. and C.N. in relation to the White Peaks' land flip transaction involving the Victim Company.

19.    On or about August 8, 2019, RAMSTETTER wire transferred $1,000,000 to a bank account controlled by J.C.L., who then immediatedly wired the $1 million to a shell entity

established by R.A. and maintained for the benefit of C.H.K. and C.N. To disguise the purpose of the payment, J.C.L. provided RAMSTETTER with a false and fraudulent invoice for services. The $1 million payment, however, was not in fact owed by White Peaks to J.C.L. or to his company, but instead, was intended to be transferred to C.H.K. and C.N., or to entities established for their benefit or under their control. At the time of this $1 million payment, C.H.K. was still an employee of the Victim Company.

20.     In or around September 2019, B.W. learned about the White Peaks land flip transaction involving the Victim Company, which RAMSTETTER and W.C. had not previously disclosed to B.W. or others at Company 1. B.W. confronted RAMSTETTER and W.C. about the transaction and then terminated RAMSTETTER and W.C. from their employment at Company 1 shortly thereafter. B.W. also demanded a portion of the profits that White Peaks received on the land flip transaction, and RAMSTETTER, W.C., and B.W. signed a non-disclosure agreement in which they agreed to settle the matter. On or about October 24, 2019, RAMSTETTER and W.C. wire transferred $5,000,000 of the proceeds from the White Peaks land flip transaction to B.W. in connection with that non-disclosure agreement.

21.     After the $5 million payment to B.W., RAMSTETTER personally retained approximately $4.9 million in proceeds from the White Peaks land flip transaction involving the Victim Company. On or about May 18, 2020, RAMSTETTER voluntarily turned over to the government the contents of the following two acounts, totaling approximately $1,483,891.95, which represented the proceeds from the White Peaks transaction that remained in RAMSTETTER's possession and control at that time: (1) UMB Bank account # 9872390059 in the name of WHITE PEAKS CAPITAL LLC MMDA ACCOUNT; and (2) UMB Bank account # 9872390172 in the name of WHITE PEAKS CAPITAL LLC OPERATING ACCOUNT.

## III.    Criminal Conduct

22.    After learning of the kickback scheme involving payments from B.W. and Company 1 to employees of the Victim Company, RAMSTETTER knowingly conspired and agreed with B.W., C.N., C.H.K., C.V.K., R.A., and others to facilitate that kickback scheme, including through interstate phone and other electronic communications in which RAMSTETTER alerted C.N. and C.H.K. to forthcoming kickback payments that they would receive in exchange for their roles in steering real estate development deals in Northern Virginia from the Victim Company to Company 1. RAMSTETTER knew and understood that this kickback arrangement was unlawful and that it violated the fiduciary duties and loyalties that C.N. and C.H.K. owed to the Victim Company.

23.    For example, on or about July 27, 2018, RAMSTETTER messaged C.N. on WhatsApp, an end-to-end encrypted messaging service, stating: "Hoping to get wires out to you today (before cut off), at worst you'll have $1,297,011.18 first thing tomorrow." C.N. replied to that message: "Beauty thanks man."

24.    On or about November 5, 2018, RAMSTETTER messaged C.H.K.: "We officially own Manassas. I'll get your money wired out tomorrow." C.H.K. replied to that message: "Damn boy be good!!" These exchanges also occurred via WhatsApp, which C.H.K. had specifically instructed RAMSTETTER to use because messages sent using WhatsApp were encrypted and could not be detected.

25.    During another WhatsApp exchange on or about December 7, 2018, RAMSTETTER messaged C.H.K.: "$1,061,160 will be wired today." C.H.K. replied to that message: "Have I told you lately? . . . That I Love You. 🙂."

7

26.    In total, during RAMSTETTER's involvement in the conspiracy, Company 1 and B.W. paid approximately $5,113,133.84 in purported "referral fees" to the Villanova Trust. All of these kickback payments were associated with real estate developments deals in Northern Virginia that C.N. and C.H.K. steered from the Victim Company to B.W. and Company 1. RAMSTETTER understood that Company 1 would not have secured these development deals with the Victim Company without the kickback payments made to C.N. and C.H.K.

27.    During RAMSTETTER's participation in the kickback conspiracy, he received approximately $300,000 in additional compensation associated with the development fees paid on Company 1's real estate development deals involving the Victim Company, over and above his standard Company 1 base salary. This approximately $300,000 paid to RAMSTETTER equated to 2% of the development fees on the real estate projects involving the Victim Company.

28.    In addition, RAMSTETTER received $150,000 from one of the shell entities that was established for C.N. and C.H.K.'s benefit, via two direct wire transfers of $100,000 and $50,000 sent on October 9, 2018, and December 12, 2018, respectively. These wire payments totaling $150,000 were made in exchange for RAMSTETTER providing inside information to C.N. and C.H.K. about Company 1's development deals with the Victim Company and keeping C.N. and C.H.K. updated on the status of the disguised kickback payments from Company 1 and B.W. to C.N. and C.H.K., via the supposed "referral fees" paid to the Villanova Trust.

29.    RAMSTETTER, C.N., and C.H.K. communicated about those $100,000 and $50,000 wire payments via interstate electronic communications, including WhatsApp exchanges. For example, on or about December 11, 2018, RAMSTETTER and C.N. had the following WhatsApp exchange, while both RAMSTETTER and C.N. were located in the Eastern District of Virginia:

RAMSTETTER: "Also I forgot to confirm, did the wire come through last week?"

C.N.: "Yep lean and mean - you can expect [$50,000]"

C.N.: "Little Xmas bonus"

RAMSTETTER: "You kidding me!?! Thank you a thousand times over."

30.     The following day, on or about December 12, 2018, C.N. sent the following message to RAMSTETTER on WhatsApp, while RAMSTETTER was still in Northern Virginia: "Hey - check your acct - money should be there / also sign the W9."

## IV.    Conclusion

31.     RAMSTETTER's actions in furtherance of the charged offense, including but not limited to the acts described above, were done willfully and knowingly, and not because of accident, mistake, or other innocent reason.

32.     The foregoing Statement of Facts is a summary of the principal facts that constitute the legal elements of conspiracy to commit honest services wire fraud.  This summary does not describe all of the evidence that the United States would present at trial or all of the relevant conduct that would be used to determine RAMSTETTER's sentence under the Sentencing Guidelines after a trial.

Respectfully submitted,

Raj Parekh
Acting United States Attorney

By: _____
Russell L. Carlberg
Heidi B. Gesch
Assistant United States Attorneys

Defendant's Stipulation and Signature:  After consulting with my attorneys and reviewing the above Statement of Facts, I stipulate that the above Statement of Facts is true and accurate.  I further stipulate that had the matter proceeded to trial, the United States would have proven the same, as well as the allegations in the one-count criminal Information, beyond a reasonable doubt.

_____
Kyle Ramstetter
Defendant


Defense Counsel Signatures: I am the defendant, Kyle Ramstetter's, attorney.  I have carefully reviewed the above Statement of Facts with him.  To my knowledge, his decision to stipulate to these facts is an informed and voluntary one.

_____
Jamie Hubbard
Counsel for the Defendant

10